# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                                                       DECISION AND ORDER

  -v-                                                    08-CR-6218 CJS


BOBBY WILLIAMS,

                           Defendant.

_____

## INTRODUCTION

The defendant, Bobby Williams, stands accused in a six-count indictment of crimes relating to drug trafficking and drug possession. In the defendant's omnibus motion, he moved to suppress items seized by the police on July 21, 2008, from his person and from a vehicle.

In regard to the defendant's application, a hearing was held on April 21, 22, 23 and 27, 2009. Sergeant Edward McDonald ("McDonald") and Officer Myron Moses ("Moses"), both of the Rochester Police Department, as well as the defendant and Larry Drumgoole[1] ("Drumgoole") testified at the hearing. After the close of the hearing, the defendant in essence moved to amend his motion papers to include an application to suppress statements, which application the Court now grants.

_____

[1]To avoid confusion, the Court clarifies that Larry Drumgoole, the defendant's uncle who was outside of 59 Chili Terrace at the time of the search, is the father of Larry Drumgoole (bearing the same first and last name), one of the individuals who was found inside of 59 Chili Terrace.

1

The Court, having considered the testimony presented and exhibits received into evidence at the hearing, and having made evaluations regarding credibility, makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

McDonald is employed as a police officer with the City of Rochester Police Department, and has been so employed since 1986.   He currently holds the rank of sergeant in the Special Investigations Section ("SIS") and is assigned to the violent crimes team. Prior to becoming a Sergeant, he was a police officer in the narcotics unit and is familiar with how drugs are manufactured, packaged, and sold at the street level in the City of Rochester. During his career with the Rochester Police Department, he has participated in the execution of over a thousand search warrants.

Moses is a police officer with the City of Rochester Police Department and has been so employed for eighteen and a half years. He is currently assigned to the SIS narcotics unit.

At about 8:30 p.m. on July 21, 2008, pursuant to their duties with the Rochester Police Department, McDonald and Moses had occasion to participate in the execution of a search warrant at 59 Chili Terrace in the City of Rochester. The search warrant, which contained a no-knock provision, authorized, among other things,  the seizure of cocaine. McDonald, as the supervisor, oversaw the execution of the warrant, was in charge of securing any money recovered, and had the authority to decide who would be charged and with what crimes.

Regarding the actual execution of the warrant at  59 Chili Terrace, Officer Simpson breached the front door and then stepped inside to allow Moses, who had the

shotgun, to enter. Then the remainder of the officers assigned to the execution of the warrant, including McDonald, entered 59 Chili Terrace. The officers entered the living room, which immediately opened up into the dining room. A small kitchen was off the dining room, and a small pantry was off the kitchen. In the kitchen were stairs leading down to a basement area. The side door to 59 Chili Terrace was secured by 2x4s, preventing entry into or exit from the residence through that door. Consequently, on July 21, 2008, the only access to the basement of 59 Chili Terrace was through the kitchen.

When he entered into 59 Chili Terrace, Moses observed: An individual identified as Demetri Everett located in the living room/dining room entranceway; two individuals identified as Garrett Martin and Larry Drumgoole[2] in the living room; and an individual identified as James Beasley in the dining room/kitchen area. Moses also observed a pitbull, and took control of the dog.

McDonald, upon entering 59 Chili Terrace, smelled an odor, which he had smelled fifteen to twenty times prior to July 21, 2008, and which he recognized to be powder cocaine being cooked into crack cocaine. Based upon his training and experience, McDonald knew that powder cocaine is commonly mixed with baking powder or baking soda, put in water, and then cooked to produce crack cocaine.

In the dining room, a quantity of cash was located. More specifically, on the dining room table was a Timberland shoe box that contained over one hundred thousand dollars in cash.

---

[2]This is the son of defendant's uncle, Larry Drumgoole, and as indicated earlier, both father and son bear the same first and last name.

Inside the kitchen, on top of a counter, there were two bags of suspected powder cocaine. On top of the microwave in the kitchen, was a large cookie-size piece of what was  suspected to be crack cocaine, and in a open cabinet, there were several other bags of what was believed to be powder cocaine.  There was also a cup with white powder residue in the cabinet, as well as some spoons, one of which was inside the cup, and a baking powder or baking soda box. Additionally, located in the kitchen cupboard was over nine thousand dollars in cash, and over three thousand dollars more in cash was found in the pantry. Moreover, there were several papers and envelopes on top of the stove,  and the burner on the front left portion of the stove was turned on. McDonald turned the burner off.

Moses, accompanied by another officer,  proceeded from the kitchen down the stairs into the basement. At the bottom of the stairs, with gun drawn, he scanned the area with a light. At first, he did not see anyone, but then, to his right, he observed a male, who was identified as Sean Brown ("Brown") hiding behind some slats of wood. Moses directed Brown to show his hands and, at the same time heard other officers yelling, "police, don't move, let me see your hands, get on the ground." Moses then noticed a second male, the defendant, to his left prone on the floor. (Hearing Transcript ("H.T."), April 23, 2009, at 128. ) When the police announced their presence in the basement, the defendant placed his cell phone, which he had been holding, on the ground.

McDonald followed other officers down the stairs into the basement. The basement itself was fairly small, was not finished, and was dirty and dark. Once in the basement, McDonald saw the defendant, whom he then handcuffed behind his back.

He also observed Brown in a corner of the basement approximately eight feet to ten feet away from the defendant. Near Brown, McDonald saw a white pot with flowers on it, inside of which was a quantity of what appeared to be crack cocaine.

The substances that appeared be powder cocaine or crack cocaine were all field tested, and each tested positive for the presence of cocaine. The combined weight of the suspected powder and crack cocaine found in 59 Chili Terrace was in excess of five hundred grams. Based upon McDonald's training and experience, the estimated value of that amount of powder and crack cocaine as of July of 2008 was over $20,000.

McDonald made the determination that the defendant was going to be arrested and charged with narcotics offenses. In making that determination, McDonald relied upon several factors: First, the quick entry into 59 Chili Terrace, based upon the no-knock warrant, which apparently took the occupants by surprise; second, the size of the house, which McDonald described as a "somewhat smaller house." (H.T., April 22, 2009, at 64; third, the odor of powder cocaine being cooked into crack cocaine which permeated the residence; fourth, coupled with the odor, a burner was turned on the kitchen stove, indicating that crack cocaine was being processed when the police entered; fifth, powder cocaine and crack cocaine in plain view in the kitchen; sixth, the proximity of the basement, where the defendant was found, to the kitchen; and seventh, the large quantity of money that was in the shoe box on the dining room table. Based upon these circumstances, McDonald concluded that the individuals within 59 Chili Terrace, including the defendant, all were involved in drug related crimes, since only those involved in cooking the cocaine, or preparing the product for distribution, or actually distributing it, would allowed into the location out of concern that anyone else

might inform the police or attempt to forcibly take the money and/or drugs.

After McDonald made the determination to arrest the defendant, the defendant was brought up to the kitchen, where McDonald searched him. McDonald found money, a wallet, and a set of keys on the defendant's person. As to the keys, McDonald placed them in an evidence bag and, in turn, placed the evidence bag into the evidence kit, which is like a tool box, into which items seized during the search were stored.

Officer Simpson had charge of the evidence kit. At some point after he was searched,  the defendant was brought onto the porch of 59 Chili Terrace, along with other individuals who were taken into custody at the residence.

Subsequently, approximately an hour after he first encountered the defendant in the basement and after the search of 59 Chili Terrace was just about completed, Moses, at McDonald's direction, took possession of one set of  keys from the evidence kit.  Other officers also took possession of the other sets of keys that had been secured in the evidence kit. The purpose in doing so was to determine which vehicles belonged to which suspects because it was expected that search warrants would be sought for some vehicles and they would be towed. At the time Moses took the set of keys from the evidence kit, he did not know it had been found on the defendant's person.

Moses then went out onto the front porch of 59 Chili Terrace where the defendant and the other occupants of the residence had been secured. Moses held up the set of keys that McDonald had removed from the defendant and asked to whom they belonged. The defendant, who was still handcuffed, responded that they were his keys. Moses then pressed the lock button on the key pad, which caused a beeping sound and caused the lights to illuminate on a blue Subaru that was parked one house

away from 59 Chili Terrace, between a street light and fire hydrant. Moses asked the defendant if that was his vehicle, and the defendant answered "Yes." Moses next asked the defendant how he could be sure that the Subaru was in fact the defendant's vehicle. The defendant then indicated that the vehicle was actually a rental and belonged to his girlfriend, but that his belongings were inside the car. Moses proceeded to ask the defendant if he could look inside the vehicle for the rental agreement and to verify that items inside the Subaru did belong to the defendant. The defendant told Moses that he could, but just to make sure that he did not tear up the vehicle. At the same time, the defendant called out to his uncle, Drumgoole, who was across the street, and asked him if he could take the vehicle to his (the defendant's) girlfriend. Moses responded by telling the defendant, in sum and substance, that he would not tear up the vehicle and that his uncle could be present when Moses checked the Subaru. Prior to asking questions about the keys and Subaru, Moses never advised the defendant of his constitutional rights. At the time he gave consent, the defendant was approximately thirty to thirty-one years old, he did not appear to be in any physical pain or suffering from any physical ailments, and he never indicated to Moses that he did not want Moses to look inside the car.

After obtaining permission from the defendant, Moses proceeded to the Subaru. He instructed Drumgoole to stand ten to twelve feet away on the sidewalk to observe what he was doing. Moses pressed the key pad, unlocking the driver's side door and opened it. He looked in the back of the vehicle and noticed a large gym bag that had clothing partially in and out of the bag. Moses observed a piece of paper on the floor, which he picked up and, upon examination, found to be a hotel receipt. Next, Moses

looked in the center console to see if he could locate the rental agreement. When he did so, he discovered personal items and a  knotted up plastic bag with a white chunky substance, which he believed to be cocaine. Upon finding the suspected cocaine, Moses locked the Subaru and notified Officer Simpson. He also told Drumgoole that they would have to step away from the vehicle, and that he was notifying another officer about what was in the Subaru.

Besides the Subaru, a Jeep was parked in the driveway of 59 Chili Terrace and a BMW was parked in front of that address. Search warrants were obtained to search these vehicles.[3]

## CONCLUSIONS OF LAW

**B.     Suppression of Statements**

By supplemental affirmation of counsel (Docket # 76) filed on May 2, 2009, four days after the completion of the hearing, the defendant, for the first time, moves to suppress any  statements he made to Moses, prior to the search of the Subaru, because he was subjected to a custodial interrogation without being afforded his *Miranda* warnings. In support of such application, counsel for the defendant states:

> Your affirmant has already acknowledged his inadvertent failure to seek suppression of William[']s acknowledgment to the police regarding the key to the Subaru. The defense respectfully requests that the Court excuse this inadvertent waiver on the basis of good cause shown.

(Supplemental Affirmation of Phillip R. Hurwitz, May 2, 2009, at 2.) The Court has no idea what counsel means by "already acknowledged," since over the course of the hearing,

---

[3]The warrants and applications, which were attached to the defendant's reply papers, were offered into evidence by the Government and received without objection.

counsel, despite being alerted by the Court to the Fifth Amendment issue, never applied

for the relief he now seeks:

> THE COURT: But for the keys, he never asked him to search the cars. The only reason – isn't it a fair statement, the only reason that Moses asked this defendant to search the car –
>
> MR. MARANGOLA: He didn't ask this defendant, he asked all of them. He didn't know whose keys they were. It was a general question to all of them, "whose keys are these," and this defendant is the only one that responded.
>
> THE COURT: Well, that statement clearly can't come in. How does that come in?
>
> MR. MARANGOLA: Whose keys these are?
>
> THE COURT: Was he Mirandized?
>
> MR. MARANGOLA: No, he was not.
>
> THE COURT: He is in custody.
>
> MR. MARANGOLA: Yes.
>
> THE COURT: It's an incriminating statement.
>
> MR. MARANGOLA: Whether it was designed to illicit an incriminating statement, I don't know.
>
> THE COURT: It's clearly an interrogation, whose keys are, I don't think there is any question that the statement falls, the statement can't come in. I mean, I guess I'm trying to understand.
>
> MR. MARANGOLA: Okay.
>
> THE COURT: Because there was no notice to use — there was no motion to suppress the statement, however. Did you give notice of the statement?
>
> MR. MARANGOLA: Yes.
>
> THE COURT: Well, there is no motion to suppress the statement.
>
> MR. HURWITZ: No, there is a motion to suppress the key.

(H.T., April 21, 2009, at 15:2 to 16:8.

> THE COURT: Mr. Hurwitz, you have a witness. Before we go, I want to clarify, so there is no mistake, that there has been absolutely no application to suppress – Officer Moses testified: As I walked out the front door, I held up a set of keys and asked whose keys they were, speaking to everyone that was on the porch. At this time, Mr. Williams said the keys were his. He testified he used the fob, the light went off. At that time I asked Mr. Williams was that his vehicle. At the time he said, yes, it was. I then asked him, I said how do I know that's your vehicle. And Mr. Williams stated, well, there is a rental agreement rented by my girlfriend, but he was using the vehicle and his clothing and stuff was inside the vehicle. Now, there has been no application to suppress those statements, am I correct?

> MR. HURWITZ: No, I did not in my motion papers make an application.

> THE COURT: And, accordingly, there has been no application to suppress the consent in any way because it resulted from these statements. I'm trying to clarify, the only basis of your application, the only outstanding application is one, there was no probable cause to arrest Mr. Williams. If there was no probable cause to arrest Mr. Williams, it appears clear based on the case I cited the first day that the consent would necessarily fall then because there has been no attenuation. The second application is even if there was probable cause, the defense still maintains the consent was not voluntarily given.

(H.T., April 23, 2009, at 200:16 to 201: 4.)

> THE COURT: I've decided he has made that motion. There has been no motion to suppress any statements made by the defendant as products of custodial interrogation.

(H.T., April 27, 2009, at 323:9-14.) In any event, counsel has now, prior to the resolutions of issues raised at the hearing and in advance of any trial date being set, requested permission to essentially amend his omnibus motion to include a motion that the statements at issue be suppressed. The Court finds no prejudice to the Government, it is undisputed that the defendant was in custody at the time Moses asked him questions about the keys and the Subaru, and that he was not advised of his *Miranda* warnings. Therefore, the Court grants the defendant's application to amend his papers to include a

motion to suppress statements.

It is  well settled that the Government may not use any statements obtained from a defendant, whether exculpatory or inculpatory, which were the product of custodial interrogation, unless prior to any questioning the defendant was advised of his Constitutional rights and knowingly, intelligently and voluntarily waived such rights. *Colorado v.  Spring*, 479 U.S. 564 (1987)*; Edwards v.  Arizona*, 451 U.S. 477 (1981); *Miranda v.  Arizona*, 384 U.S. 436 (1966). .

Here, as indicated above, the defendant was not advised of his *Miranda* rights by law enforcement before Moses questioned him about the keys and the Subaru. Consequently, since the defendant was clearly in custody, his motion to suppress his statements is granted.

**B.      Suppression of Physical Evidence**

In his post hearing memorandum of law, the defendant argues for suppression of his cell phone, recovered by the police from the basement floor at 59 Chili Terrace, along with the contents of the phone, the items taken from his person, including money, a wallet, and a set of keys, and items seized from the Subaru, including the suspected cocaine.

**1.      Cell Phone and Its Contents**

The defendant's application to suppress the cell phone at issue, along with the contents of the cell phone, was denied by the Court, prior to any testimony being taken, on the record on April 21, 2009. As to the cell phone, it is undisputed that the defendant did not allege standing with respect to the search of 59 Chili Terrace, and, in this regard, the following exchange occurred between the Court and defense counsel:

THE COURT: So what? The phone was not found on Williams, it was found on the ground.

MR. HURWITZ: It was found on the ground next to him. My client tells me he had it in his hand. He had it in his hand and he dropped it when the police came down.

THE COURT: So what? If he dropped it when the police came down and it was on the floor.

(H.T. April 21, 2009, at 32:4-8.)

Subsequently, the Court rendered its decision:

THE COURT: Note the presence of Mr. Williams, Mr. Hurwitz and Mr. Marangola. I went through the motion argument, I did deny suppression of the information found in the cell phone. We did flesh out at oral argument everyone's positions. I did indicate that I found probable cause for the issuance of the warrant, questioned whether the government was making a good faith argument, gave both opportunity the – both parties a chance to submit additional clarification, since it was confusing. Mr. Hurwitz, you indicated that you already submitted your reply and you would rely on that. Mr. Marangola, I asked if you wanted to submit, since we were fleshing everything out at oral argument, any additional affirmation alleging good faith. You asked for permission to do it orally. I gave you permission to do it orally, but the Court found with respect to the search of the cell phone, one, that the warrant was supported by probable cause; and, two, that even if it wasn't, I found the good faith exception *Leon* applied. So, Mr. Hurwitz didn't concede it, but I made findings, so that issue is not before the Court.

To the extent you're arguing that somehow – and this argument wasn't made before – that it was on the floor but the police could see it, but couldn't seize it, the Court rejects that. Clearly if there was no standing to object to the search of the premises and the item was not on Mr. Williams, it seems clear that there is no – he has no standing to object to the seizure of an item that was not on his person. So, you can have an exception to the ruling.

(H.T., April 21, 2009, at 38:23 to 39:24.)

### 2.    Items Recovered from Defendant's Person – Money, Wallet, Set of Keys

The defendant maintains that the items removed from his person were illegally

seized, since the police lacked probable cause to arrest him. The Court disagrees. In that

regard:

> The long-prevailing standard of probable cause protects "citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime," while giving "fair leeway for enforcing the law in the community's protection." *Brinegar v. United States*, 338 U.S. 160, 176 (1949). On many occasions, we have reiterated that the probable-cause standard is a "'practical, nontechnical conception'" that deals with "'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Illinois v. Gates*, 462 U.S. 213 (1983) (quoting *Brinega*r, *supra*, at 175-176; *see, e.g.*,*Ornelas v. United States*, 517 U.S. 690, 695 (1996); *United States v. Sokolow*, 490 U.S. 1, 7-8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). "[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S., at 232, 103 S.Ct. 2317.

> The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. *See ibid*.; *Brinegar*, 338 U.S., at 175, 69 S.Ct. 1302. We have stated, however, that "[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt," *ibid.* (internal quotation marks and citations omitted), and that the belief of guilt must be particularized with respect to the person to be searched or seized, *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). In *Illinois v. Gates*, we noted:

> "As early as *Locke v. United States*, 7 Cranch 339 (1813), Chief Justice Marshall observed, in a closely related context:

>> [T]he term "probable cause," according to its usual acceptation, means less than evidence which would justify condemnation .... It imports a seizure made under circumstances which warrant suspicion.' More recently, we said that 'the quanta ... of proof' appropriate in ordinary judicial proceedings are inapplicable to the decision to issue a warrant. *Brinegar*, 338 U.S., at 173. Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the [probable-cause] decision." 462 U.S. at 235.

To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide "whether these historical facts, viewed from the standpoint of an objectively

reasonable police officer, amount to" probable cause, *Ornelas*, *supra*, at 696.

*Maryland v. Pringle*, 540 U.S. 366, 370-71(2003). Furthermore, a law enforcement officer may use his experience, training and knowledge as a factor in determining that probable cause connecting a defendant with criminal activity exists. *Texas v. Brown*, 460 U.S. 730, 742-43 (1983); *United States v. Almanzar,* 49 F. Supp. 538, 540 (S.D.N.Y. 1990).

Here, the Court, having examined the events leading up to the defendant's arrest, concludes that these historical facts, viewed from the standpoint of an objectively reasonable police officer, amounted to probable cause. *Ornelas v. United States*, 517 U.S. at 696. More specifically, the Court relies on the following: The execution of the no-knock warrant would have taken the occupants of 59 Chili Terrace by surprise; 59 Chili terrace was not a large residence; the odor of powder cocaine being cooked into crack cocaine permeated the residence; the burner was turned on in the kitchen, indicating that crack cocaine was being processed when the police gained entry; powder cocaine and crack cocaine were in plain view in the kitchen; over one hundred thousand dollars in cash was sitting in a shoe box on the dining room table, as well as over nine thousand dollars in cash in the kitchen and over three thousand dollars in cash in the pantry; the only way into the basement was through the kitchen; the proximity of the basement, where the defendant was found, to the kitchen; the defendant was found in the basement about eight feet from Brown, who had near him a white pot, inside of which appeared to be cocaine; and McDonald's conclusion, based upon his training and experience, that all of the individuals within 59 Chili Terrace, including the defendant, were involved in drug related crimes, since only those involved in cooking the cocaine, or preparing the product for distribution, or actually distributing it would be allowed into the location out of concern that anyone else

14

might inform the police, or attempt to forcibly take the money, or drugs, or both.

Since the Court, as indicated above, has found that probable cause existed to arrest the defendant prior to the search of his person by McDonald, the keys, wallet, and money were validly seized incident to a lawful arrest. *United States v. Robinson*, 414 U.S. 218, 235 (1973). Consequently, the defendant's application to suppress these items is denied.

### 3.    Items Recovered from the Subaru

The defendant argues that the items seized from the Subaru should be suppressed since the defendant never gave *any* consent to Moses to search the vehicle, let alone voluntary consent. He also seems to suggest that, based upon the suppression of statements he made to Moses, these items must be suppressed as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471-488 (1963).

At the outset, the Court must resolve what effect the suppression of the statements made by the defendant to Moses relating to the keys and the Subaru has on the validity of any subsequent consent. In analogous situation, the Third Circuit found that suppression of physical evidence was not required:

> The District Court conducted a suppression hearing, during which the government presented the testimony of one of the FBI agents who had been at the scene. The government offered no evidence that the agents knew defendant was carrying a weapon or had access to one. Nor did the prosecution present any testimony that the agents were aware of the defendant's previous use of a firearm.

> Based on this evidence, the Court found that because *Miranda* warnings had not been given, the defendant's statement that a gun was in his car should be suppressed. Rejecting the government's contention that the public safety concerns expressed in *New York v. Quarles*, 467 U.S. 649 (1984), were applicable, the trial judge said this was a "routine arrest scenario."

> The Court, however, ruled that the pistol itself was admissible and the fruit

of the poisonous tree doctrine did not apply because the defendant's statement was voluntary, albeit inadmissible, under *Miranda*. Relying on *Oregon v. Elstad*, 470 U.S. 298 (1985), the Court observed that a *Miranda* breach does not necessarily preclude the use of all evidence flowing from the infraction. Moreover, this Court had observed that *Elstad* rejected the proposition that the fruit of the poisonous tree doctrine, announced in *Wong Sun v. United States*, 371 U.S. 471 (1963), applied to *Miranda* violations. *United States v. Johnson*, 816 F.2d 918, 922-23 (3d Cir.1987). Finally, the District Court concluded that the defendant's voluntary statements provided probable cause to search his car. *See United States v. DeSumma*, 44 F. Supp. 2d 700 (E.D. Pa.1999).

On appeal, defendant contends that the District Court erred by admitting the pistol into evidence.

\* \* \*

In *Wong Sun*, narcotics agents arrested the defendants in their homes without probable cause or reasonable grounds. *Wong Sun*, 371 U .S. at 473-78, 83 S.Ct. 407. The Supreme Court held that because Fourth Amendment violations had occurred, the evidence stemming from those arrests must be excluded from the trial as "fruit of the poisonous tree." *Id.* at 488.

The defendant in *Elstad* gave an incriminating statement before receiving *Miranda* warnings. *Elstad*, 470 U.S. at 300-01. Later, after having been advised of his *Miranda* rights, defendant gave a written statement that was introduced at trial. *Id.* at 301-02. The Supreme Court rejected the defendant's contention that the second confession was the fruit of the poisonous tree. *Id.* at 308. The Court explained that the purpose of the Fourth Amendment's exclusionary rule is "to deter unreasonable searches, no matter how probative their fruits." *Id.* at 306 (emphasis added). The *Miranda* exclusionary rule, in contrast, serves the Fifth Amendment and applies more broadly than the Amendment itself. *Id.* Thus, a voluntary statement that would be admissible under the Amendment may be barred because of the lack of a *Miranda* warning.

The Court explained that the Fifth Amendment bars the prosecution from using compelled testimony in its case in chief because the failure to administer *Miranda* warnings creates a presumption of compulsion. *Elstad*, 470 U.S. at 306-07. Consequently, even unwarned voluntary statements are excluded from evidence. *Id.* at 307. The Court continued, however, "the *Miranda* presumption ... does not require that the statements and their fruits be discarded as inherently tainted." *Id.* at 307. A defendant whose confession is inadmissible may not "enjoy the freedom to 'deny every fact

disclosed or discovered as a "fruit"of his confession'...." *Id.*; *see also Harris v. New York*, 401 U.S. 222, 225 n. 2 (1971) (rejecting defendant's request to suppress such evidence as an extravagant extension of the Constitution). *Elstad* emphasized that "[v]oluntary statements remain a proper element in law enforcement" and admissions of guilt, "if not coerced, are inherently desirable." *Elstad*, 470 U.S. at 305 (internal quotations and citations omitted). The element of police misconduct is not a factor that comes into play when the prosecution uses a voluntary statement.

Applying the *Wong Sun* fruits doctrine where the evidence is obtained as the result of a voluntary statement, would be inconsistent with deterring improper police conduct and the goal of assuring trustworthy evidence. Id. at 308, 105 S.Ct. 1285. No constitutional violation occurs in such a situation unlike the circumstances where an unreasonable search occurs or a coerced confession is obtained.

*Johnson* relied on *Elstad* in holding that "[w]here a subsequent confession is obtained constitutionally, the admission of prior inadmissible confessions was harmless error." *Johnson*, 816 F.2d at 923. We summarized *Elstad* as "specifically reject[ing] the proposition that the 'fruit of the poisonous tree' doctrine, which in the fourth amendment context requires the exclusion of evidence or confessions obtained as a result of a constitutional violation, extends to violations of the *Miranda* decision." *Id.* at 922.

Other cases are in accord. *See United States v. Elie*, 111 F.3d 1135 (4th Cir.1997) (derivative evidence obtained as a result of a voluntary unwarned statement not fruit of the poisonous tree); *United States v. Mendez,* 27 F.3d 126 (5th Cir. .1994) (derivative evidence admissible); *United States v. Gonzalez-Sandoval*, 894 F.2d 1043 (9th Cir. 1990) (same); *United States v. Sangineto-Miranda*, 859 F.2d 1501 (6th Cir. 1988) (same). But *see United States v. Byram*, 145 F.3d 405, 410 (1st Cir. 1998) (applying the fruits doctrine 'where there is a substantial nexus between [*Miranda*] violation in the second statement, where the second statement is not itself preceded by an adequate *Miranda* warning').

After the District Court entered its judgment in the case before us, the Supreme Court held in *Dickerson v. United States*, 530 U.S. 428 (2000), that *Miranda* was a constitutional rule that Congress could not supersede legislatively. 530 U.S. at 444, 120 S.Ct. 2326. Defendant seizes on *Dickerson's* ruling, arguing that the pronouncement of *Miranda's* constitutionality casts doubt on the earlier cases denying suppression of derivative evidence. He emphasizes that the opinions refusing to apply *Wong Sun* referred to the fact that *Miranda* was only "prophylactic" and not constitutional.

We cannot agree with the defendant's reading of *Dickerson* because the Supreme Court appeared to anticipate and reject it. The Court explained that "[o]ur decision in [*Elstad*] – refusing to apply the traditional 'fruits' doctrine developed in Fourth Amendment cases – does not prove that *Miranda* is a nonconstitutional decision, but simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment." 530 U.S. at 441. *Dickerson* thus continued to observe the distinction between *Miranda's* application to cases involving the Fifth, rather than the Fourth, Amendment. Ultimately, the Fifth Amendment prevents the use of the non-Mirandized statement rather than the introduction of derivative evidence.

We hold that the fruit of the poisonous tree doctrine does not apply to derivative evidence secured as a result of a voluntary statement obtained before *Miranda* warnings are issued. Thus, even though the defendant's seized gun was secured as a result of his non-Mirandized statement, it was properly admitted.

*United States v. DeSumma*, 272 F.3d 176, 178 -181 (3rd Cir.2001); *see also United States v. Sangineto-Miranda* 859 F.2d 1501, 1515 -1519 (6th Cir. *1988); United States v. Bin Laden*, No. 98 CR. 1023 (LBS), 2001 WL 30061, 3 (S.D.N.Y. Jan. 2, 2001). In this case, the defendant does not contend that the statements that he made to Moses, which were suppressed because he was not Mirandized, were not voluntary. Therefore, whether the items found in the Subaru are admissible turns on whether the defendant's consent to search the vehicle was voluntary.

The general rule is that all warrantless searches, even when based on probable cause, are "per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). "One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The Government, of course, bears

the burden of establishing by a preponderance of evidence that consent was voluntarily given. *United States v. Buettner-Januscch*, 646 F.2d 759, 764 (2d Cir. 1981). To be voluntary means that the consent was obtained without coercion. *Schneckloth v. Bustamonte*, 412 U.S. at 228. In that regard, voluntariness is determined based upon the totality of circumstances, with a view as to whether consent was the product of free choice rather than merely the acquiescence to authority. *Id.* at 226; *United States v.* Wilson,11 F. 3d 346, 351 (2d Cir. 1993); *United States v. $19,047.00 in U.S. Currency*, 95 F.3d 248, 252 (2d Cir. 1996). Therefore, although it may be a factor in ascertaining whether the consent was coerced, knowledge of the right to refuse consent is not a requirement to a finding of voluntariness. *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995).

In analyzing the totality of circumstances, a number of factors are relevant. These generally include such considerations as age, education, background, and physical and mental condition, as well as the setting in which the consent is obtained. *Schneckloth v. Bustamonte*, 412 U.S. at  226. The fact that a defendant is in custody does not, by itself, render consent involuntary, *United States v. Arango-Correa*, 851 F.2d 54, 57 (2d Cir. 1988) Nor does a finding of coercion follow from the fact a defendant was handcuffed. *United States v. Crespo*, 834 F.2d 267, 271 (2d Cir. 1987), *cert. denied*, 485 U.S. 1007 (1988). Moreover, as this Circuit has observed that the Supreme Court, in *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) that,

> "[t]he touchstone of the Fourth Amendment is reasonableness[,]" 500 U.S. at 250, and the "standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id*. at 251; *see also United States v. Snow*, 44 F.3d 133, 134-35 (2d Cir.1995) (same (quoting *Jimen*o, 500 U.S.

at 251); *United States v. Davis*, 967 F.2d 84, 87 (2d Cir.) (same (quoting *Jimeno*, 500 U.S. at 251), *cert. denied*, --- U.S. ---- (1992). Thus, "[t]he Fourth Amendment is satisfied when, under the circumstances, it is objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to [conduct the search that was undertaken]." *Jimeno*, 500 U.S. at 249, 111 S.Ct. at 1803.

*United States v. Garcia*, 56 F. 3d at 423.

In considering the totality of circumstances, the Court finds that the Government has established by a preponderance of evidence that the defendant voluntarily consented to the search of the Subaru.[4] First, at the time he gave consent, the defendant was approximately thirty to thirty-one years old. Second, he did not appear to be in physical pain or suffering from any physical ailments. Although handcuffed, he had been in custody for approximately one hour, a sufficient amount of time to adjust to the circumstance of his arrest, especially in light of the fact that, during such time, he had not been subjected to any interrogation by the police. Third, it was the defendant who volunteered to Moses, in response to Moses' inquiry which was directed all the occupants of 59 Chili Terrace secured on the porch, that the keys were his. Fourth, in giving Moses permission to look inside the Subaru, the defendant told him not to tear up the vehicle. Fifth, at the time he gave consent on the porch, the defendant could observe his uncle, Drumgoole, who was across the street and asked him if he could take the Subaru to the defendant's girlfriend. Finally, Moses did not engage in any coercive conduct, such as threats or physical force, to get the defendant to consent. Considering all these circumstances, the Court determines it was objectively reasonable for Moses to believe that the defendant's consent search the

---

[4]In reaching its determination, the Court rejects as not credible the defendant's testimony that he never gave Moses permission to look inside the Subaru.

Subaru was voluntary. *United States v. Garcia*, 56 F.3d at 423.[5]

## CONCLUSION

Accordingly, the defendant's motion (Docket # 59 & 63) to suppress physical evidence is denied. However, his application to suppress statements (Docket # 76) is granted.

IT IS SO ORDERED.

DATED:     June 9, 2009
           Rochester, New York        ENTER.


                                      /s/ Charles J. Siragusa
                                      CHARLES J. SIRAGUSA
                                      United States District Court Judge

---

[5]Since the Court has found that the Government has established by a preponderance of evidence that the defendant's consent was voluntary, it need not consider the Government's alternative argument of "inevitable discovery."